This is GoDaddy 2023-2265. Mr. Nortoff. Good morning, and may it please the Court. This appeal relates to at least two errors made by the District Court below. The District Court erred in determining on summary judgment that the defendant did not infringe the 397 and 168 patents, including its construction of runtime engine. And the District Court also erred in entering judgment after verdict of non-infringement relating to the 755, 287, and 044 patents, denying plaintiffs renewed motion for judgment as a matter of law in new trial. With respect to the first issue, the 397 and 168 patent, that decision should be reversed for two separate reasons. First, the Court incorrectly construed runtime engine to require reading from a database. And second, even applying the Court's construction, the Court improperly found summary judgment, further limiting the claim to directly reading and excluding reading from a database using an API, which is the only way to read from a database. Can I just be sure I understand one thing? Does everybody agree that on this question, the runtime engine and what it has to do by way of interacting directly or indirectly with the database has the same answer regardless of which claim language we're talking about in the 397 or 168? One of them has utilize, one of them has do something from the data that has been extracted. Those are the two bits of language, is that right? That's correct, Your Honor. So why does the, is that right? Everybody thinks that those have to. Certainly Planoff's position is that it doesn't matter between the claims. The 168 patent requires, actually says runtime engine, and what that construction is, whether it's reading or utilizing, and the 397 patent refers to a runtime file, which includes runtime engine. I think Godaddy has made some arguments on appeal about the extracting language from the 168, but from our perspective, that doesn't change the claim. So I guess one of the things, again, I'm a little bit confused about this. I would have thought that this question of the interaction of the engine with the database was addressed not by the phrase runtime engine or runtime files, but rather by the verbs being used, utilized, or do something from that has been extracted or extracted from. I'm interpolating that has been. Why is the focus just on the term itself, or did everybody understand that the term was going to somehow be understood in light of other language? I think it's obviously had quite a history. There's been a lot of cases, a lot of arguments, but it all, the decision stems from the word reading. What does reading mean? But that's not in the claim. It's not in the claim. In our position, it shouldn't be in the claim or in the construction. The patents are all about storing user settings in a database and having a runtime engine that generates a web page at runtime, and all it has to do is use or utilize those settings. It's a 100-page patent. The focus is not on how does the runtime engine get that information from the database. It's the fact that it's using those two things, user settings in a database and a runtime engine that goes at runtime. I agree that the patent specification does disclose an embodiment in which the runtime engine is reading the information from the database. I take it your position is that the claim itself doesn't recite it because it uses different verbs. That's correct, Your Honor. The specification does disclose embodiments where it describes a runtime engine that reads from a database, and it does that in different ways. But the claim's specifically different than that, and it says it utilizes information, and the prosecution history has a lot of arguments where it's talking about the runtime engine is using this information. It amended the claims to specifically recite utilizing information, and so the... Well, here, I guess I just want to go back one more time to what I remain puzzled about. If the construction here was of the phrase runtime engine, then why does it matter what the other claim language, language in the claim utilized or extracted from is? And then if that doesn't really matter, then there are some statements about what the runtime engine does, like, you know, what is it, columns three and five, that seem to say the runtime, without saying in an embodiment, I mean, maybe that's implicit, you can have an argument about that, but at least not there saying, and then also in the prosecution history where you said a couple of different times, the runtime engine reads, and if all we were talking about is runtime engine, without regard to the other claim language, utilize or extracted from, then why isn't that a fair understanding of that term alone, because you don't have to fight against an obviously broader set of claim terms, claim verbs. If I understand your question correctly, there's not disputes about the other claim language that the GoDaddy system uses these other terms. For example, in the 168 patent, that the runtime engine uses user settings that were extracted from the database. The only dispute is whether or not the runtime engine reads from the database, and whether or not that should be included in the construction of runtime engine or not. And our position is, the claims are clear, the plain and ordinary meaning is, you utilize information from the database, and there's no reason to read in reading from the specification, and even if you look at the sites of the prosecution history, there are arguments about the runtime engine reading, but the claims were later amended and overcame the prior art by using the utilizing information, and where they specifically said, the runtime engine is using this information. And so we think it's clear that the claim construction was incorrect, and that the case should be reversed and remanded on that reason alone. Is there any evidence at all that the word runtime engine, according to its plain and ordinary meaning, is something that has to read a memory? Not that we're aware of, and I don't think anyone's made that. Is there any evidence in the record on that? No, Your Honor. The arguments from the defendants on runtime engine were just the specification and some of the arguments in the prosecution history where they were saying it should be limited based on those statements. There is a statement in the prosecution history that says, it's one statement, there's some statements that say the memory is, information in the memory is read, it doesn't say who's doing the reading or what's doing the reading, but there's one statement that says runtime engine reads the memory. What is your best argument for why that's not limiting, and why that shouldn't define where runtime engine is? Because there clearly was not, there was not a clear disavowal that says our patent is only about a runtime engine that reads itself in no other way. I would say this, you said clear disavowal, I guess clear disavowal works, go ahead. So you're saying if the plain and ordinary meaning of runtime engine, or if the ordinary meaning, forget about the plain, is, doesn't, it doesn't have to be something that reads from a memory, then there's going to have to be something like lexicography, or disavow in the specification of the prosecution history in order to read that limitation into that noun? That's our position, Your Honor, and especially when you look at the other statements in the prosecution history where there were later amendments, and there were other statements that clearly said the runtime engine can use information from the database. It talked about the runtime engine can be a template shell, and there's evidence in the record that one of the school in the art understands that that template shell can be filled in from other programs, so that the runtime engine doesn't have to do that itself. So. In particular prosecution history statements that you've just been discussing, is the, is the art that's being distinguished by those statements art in which there's use of the database, but not reading? No, Your Honor, the prosecution, those arguments really focused on what this whole patent, what these patents are about. Well, this is Faustini, I think, is one of them, right? Yes, correct. Faustini. Faustini, is it the T, Faustini, sorry. How to understand what those statements that you made should be taken is often affected by what the nature of what you're distinguishing, and I, I'm trying to understand if this is actually something that needed to be distinguished on this reading ground. No, absolutely not, Your Honor. There was not that, that there was some runtime engine that was getting information the other way and we said, well, ours reads directly from the database itself and that's what's patentable. The arguments were the prior art doesn't teach this, these user stored settings being stored separately and then those user settings from the database being used at runtime to generate the web page. That was the real crux of the invention. That's what those arguments were about. Can you, can you, I mean, I, my recollection, although I might have my cases confused, it's been a long week, but for, would the examiner have reasons for allowance? And what did they say? I don't recall any particularly helpful or, actually any reasons for allowance, Your Honor. I don't know that answer off the top of my head, but I don't think we've ever cited them or either side has referred to them. So I don't have them in my record sites in front of me. For what it's worth, I, I too have in my head that in preparation for today, there was some reference to reasons for allowance, but maybe it's not this case. I will check, unless there's further questions, I'll reserve the rest of my time for rebuttal. That's fine. Mr. LaCourte. Good morning. May it please the Court. It's always a pleasure and privilege to be before the Federal Circuit. I will address the summary judgment issues and move to the J Mollen new trial issues following that. I would like to pick up on the claim construction issues and address a couple of the questions that were raised in particular about the prosecution history. So at Appendix 624 through Appendix 6 to, excuse me, 6, 625 to 6, 624 to 626, and also importantly Appendix 616, there is significant discussion by Express Mobile that Godaddy content is sharply relevant to what the runtime engine does in the context of this other claim term utilizes. So what Express Mobile is saying to the patent office in part to overcome Faustini is that the runtime engine of Faustini is fully baked in settings and there is no reading of a database to get the settings as the claimed runtime engine does. I read this language that you're talking about. I read these pages and the only place where I saw that it said the runtime engine reads the database is on page 616. Am I wrong? Yeah, I mean if there's other places I'd like to know because the other references are talking about the runtime file, you know, using that information, the runtime engine using that information, but the only place where I saw where it said what was reading it was a runtime was on 616. Yes, but I understand your point, Your Honor, but on 624 the specific distinction is that Faustini runtime code, all of the information necessary. Can you help me out by telling me whereabouts on the page so I can follow along? Yes, of course. So I'm on appendix 624. I'm in the middle paragraph which is about the second complete sentence that begins, in particular, the web pages generated by Faustini result from a Faustini runtime engine which is an interpreted or executable file such as virtual machine command and which is the information necessary to generate the display. In contrast, the claimed invention generates web pages using two features, a runtime engine and a database of user settings. The runtime engine used to accept the attributes and generate virtual machine commands which then generate the display. When you compare that with the second page that GoDaddy cites, which is appendix 616, Express Mobile is saying that the websites using the claimed runtime engine are generated by the runtime engine reading and interpreting the external database and then building the web pages dynamically which lead to the generation. It could also be that in the prior art there wasn't in the database, but that is another distinction right there. Let me ask you something else. On the notice of allowance that I was asking your adversary about, it's on page A4596 and it says that the prior art Faustini and WishMe do not show a runtime file utilizing user-selected settings stored in a database to generate virtual machine commands. So there's nothing about read there. Yes, so our position on the juxtaposition of utilize and the runtime engine reading is that the runtime files may utilize other data or data to help generate the virtual machine commands, but the actual settings to display the web page are as disclosed in the specification repeatedly in the context of the runtime engine. The database is read to extract those settings and then enable the completion of the build of the website and the display of the website. What about the examiner's reason for allowance? I may be more specific. Why should we win a claim that doesn't use the word read, but instead uses the word utilize? And then the examiner's reason for allowance says utilize. Why should we say that it has to read? Well, that's what the patent owner says the runtime engine does. So the runtime engine is part of the runtime files. The runtime files may utilize data for the generation of virtual machine commands, but to get the settings to display the web page, the database must be read. Sure, but it doesn't say who has to read it. The claim doesn't. It doesn't even, I mean, anyway. I don't want to. I want to make sure you get the benefit of my thoughts right now, and I want to have your thoughts and response. So that's why I interjected there. But I appreciate your response, which is that I think you're relying on the specification and the prosecution history. And it's not only the prosecution history. It's the specification as multiple jurists, including the PTAB in the appeal you just heard. Has this court reviewed that claim construction? This court has not reviewed the claim construction. But the appeal you just heard, the position of Express Mobile was that reads the database is the appropriate construction. But did the board adopt that construction? Yes. No, it did not. It did not. If you look back at that other case in the board's decision, what it said was, we don't need to decide this dispute right now, that is, whether it's read or utilized, because we find the prior teaches it regardless. So they specifically said we're not deciding it. The point I want to emphasize is that in Paper 19 in the meta-IPR, it is clearly stated by Express Mobile that reads from the database. In that IPR should be the construction and that it comports with Phillips and that it is consistent with all of the other jurists. So our point is, if that's the position in that matter involving invalidity, it was the position in this matter. In fact, Express Mobile agreed with reads the database below. Can I ask you, are parties bound by, even if you're right about that, are parties bound by positions they take that then the tribunal doesn't adopt? Well, I think for judicial estoppel, the point is that that's the position you took in the invalidity case, and as this court has ruled, uniformity is important. So that is that you should not be able to switch positions in another case because it suits you. Perhaps the most important part of this is the specification exclusively teaches. Just to be clear, I mean, judicial estoppel always or almost always requires that you get a benefit out of the first thing you said, and once you get that benefit, you can't turn around. Agreed, Your Honor. That didn't happen because they lost the IPR. Agreed. But the position has been taken by Express Mobile in the invalidity context that it should be reads. The position was taken below by Express Mobile that it should be reads. That was proposed as one of the alternative constructions, not merely utilized. The position was found to be the appropriate construction by other jurists, and I agree, Judge Stoll, it was not necessarily decided by this circuit. But it certainly, throughout the intrinsic record, it is, by all means, supported as the exclusive discussion of what the runtime engine does. And in the 168 patent, the exact term is runtime engine. Now, the runtime engine isn't described in the specification as having the sole function of reading data from a memory, right? I intended to say that it exclusively describes that it reads the database. It doesn't describe that it does something other than reading the database to get the settings in order to generate the display of the web page. I'm happy to continue to talk about claim construction. I have about six minutes left. I wanted to address the other issues in the summary judgment decision. The court below found that there was no evidence presented by Express Mobile that the runtime engine 3 actually reads the database, goes to the database, hits the database to extract the settings. And so the evidence below, which was simply the substantial evidence from GoDaddy of the way its system works versus the ipsy-dixit position of the Express Mobile expert that there is a fetch call to get the data, so it must be. What makes that ipsy-dixit? I mean, the expert examined the code and said there is this fetch function part of whatever it is. This is, I forget what the name of the file is, script.js or something. And that sends kind of a message out. The message may take one or two hops before it gets to the database. But why, if the only thing you have is the term read that's not further defined, why is there not a factual dispute about whether that process is covered by read? So the single line of code that has the word fetch from the expert, otherwise it's just the settings that are baked in. So all of the evidence was the actual settings. So the single line of code is at appendix 6006. Yes. And the expert says that... The expert? Which expert? The Express Mobile expert says that the word fetch appears in the code and then concludes that that is a call to the database to obtain settings necessary to generate the display of the web page. The actual code has the word fetch, but in the form that the expert says it would be, the parenthetical, it's fetching something. The actual code is t.url, not a web address, literally just a generic URL, like a blank to be filled in. And from that one snippet is the entire basis to say that there is a runtime engine by virtue of that JavaScript calling the database or an API to get the database and extract the data. And our position below and on appeal is that one snippet proves nothing and the ipsy-dixit, Your Honor, is to simply say that is a fetch call that does this when it's not described in the code. The rest of the so-called fetch calls... By the way, can you give me a JA site for where your expert explains why this fetch line doesn't do what the other side's expert says it does? Yes, Your Honor. So our GoDaddy technical engineers, Mr. Silvis and Mr. Jarrett, but in particular Mr. Silvis, from Appendix 5410 to 5418. Excuse me, I'm citing another section. Apologies. Appendix 4790 to Appendix 4798. This is the crux of the problem with that one fetch call. The engineer says all of the script.js that is referred to as quote-unquote retrieving data in JSON format is actually static HTML code. It is code that is flat. It is as stored. It is not calling an API or a database. If it were, it would say in the parens, GoDaddy.com forward slash API. Now, I am saying that, but obviously a generic just the letters URL is not going to the database. What's the T dot in front of URL? So the T colon could be anything. The problem is that Express Mobile Expert doesn't show or connect the dots, which is the ipsy-dixit, that that is a call to an API. Obviously a call to an API would reference the API. A call to the database would reference the database. So the GoDaddy engineers are saying all of this static script is just what the browser reads to load the database. Excuse me, to load the website. It is not a data call. And that is the single point of evidence, Judge Trentham, that is the expert's reference repeatedly to intoning this phrase, the runtime engine JavaScript files fetch user-selected settings from the database using the function called fetch to an API such as the vNext API or DPS API. That statement is not borne out by that one-line snippet with the word fetch. There is no reference to an API. There is no reference to the Cassandra database that is accused. And there is no connection of the dots other than that conclusory statement. So the result is, as Judge Kennelly said below, Express Mobile, you have not established, and I quote, that the runtime engine category 3 actually reads the database against the evidence that the GoDaddy system isn't designed to do that. It's static code with the settings delivering the site. So thereby its design would not be a call to the database to get the settings. I will just simply say with my three seconds over, the trial below, under the narrow standard of review, should stand and remain undisturbed in terms of the jury's verdict. I'm happy to answer any other questions that the court has. Thank you, counsel. Thank you very much. I appreciate it. Mr. Nuttall has some rebuttal time. Thank you, Your Honor. I'll try to just address a few of those points briefly. With respect to the claim construction during the IPR, there were numerous defendants, including the petitioner in that case, who had argued and successfully obtained the reading from a database claim construction. Express Mobile, in its patent owner response, merely said they should be held to the claim construction that they're advocating and obtained, and the court is right. The PTAB said this construction doesn't matter for this IPR, and either construction we find the same. Would I be right to think that that element in the claim was all about whether Reynolds taught it and Reynolds did this? Or have I confused things? I actually think the issue in that case related to runtime file, Express Mobile was arguing that the 168 claim should have some of the elements of the runtime file, and the PTAB disagreed. And so there was overlap with this runtime engine issue. That was part of the patent owner response, too. I fully admit that. But ultimately, the PTAB said this issue about the runtime engine, if it still takes retrieval of information or reading from the database, doesn't matter for this. We find it's not relevant to our decision. So Express Mobile certainly obtained no benefit from the reading from a database construction, which the PTAB basically said it doesn't matter for that IPR. With respect to some of the issues counsel raised on the fetch command and the summary judgment, I think those are generous at best to say that that was the basis for the district court's decision. The district court below said you're using an API, you're using these pipeline of files, that can't be, that's not reading. There is no dispute that the script.js runtime engine has a fetch command. The evidence in the record is that that calls on the database using an API. An API is... And you say the evidence is that, is there more than what I think your friend on the other side said was your expert's ipsy-dixit assertion? Yes, Your Honor. There's several expert reports. There's the deposition. Talking specifically about the fetch command. Yes, Your Honor. And ultimately, you know, to say that a reading does not include, if you use an API, you're no longer reading from a database, would literally render these claims meaningless. Because as their experts admitted, it's the only way to do it. It's the only practical way to do it. It's fundamentally how you read from a database. And if the court's claim construction requires reading, and you have specific commands in a runtime engine that say go fetch from a database, but if you use the API that you're no longer reading, then these claims don't cover anything. Because there's no other way to read from a database. But I think the issues that the counsel was raising are disputed issues of fact. Our expert did show how user settings were pulled from GoDaddy's database using these runtime engines. And they were used to generate these websites. GoDaddy certainly made a dispute there. And did your expert talk specifically about why a fetch command followed by parenthesis T period URL could be a, could be understood as go to some database to find something for me? Yes, Your Honor. Our expert went through how that fetch command gets user settings and that's used to generate the database. I kind of found it interesting that this T.URL became the focus of GoDaddy's argument here. Because that certainly wasn't, I don't think, argued or the focus of summary judgment or the court's decision below. The court's decision below was you have this pipeline of files or, you know, and referring to other declarations that don't relate to this runtime engine. There were a series of what we think are clear misstatements of the factual record. And at the very least there's a disputed fact about is using a fetch command to get information from a database by using an API infringement or not. And those are issues of fact that should go to a jury. And unless there's other questions, Your Honor, we'll concede my last seven seconds here. Thank you, counsel. Both counsel, the case is submitted.